ARKANSAS ELECTRIC COOPERATIVE and Arkansas Rural Electric/Sit. *v.* John W. RAMSEY (Deceased); Leigh Ramsey

CA 03-1442                                                    190 S.W.3d 287

Court of Appeals of Arkansas
Division IV
Opinion delivered September 1, 2004

Supplemental Opinion on Denial of Rehearing November 3, 2004.

*Friday, Eldredge & Clark*, LLP, by: *Betty J. Demory*, for appellants.

*Hilburn, Calhoon, Harper, Pruniski & Calhoon, L.T.D.*, by: *David M. Fuqua* and *Patrick L. Spivey*, for appellee.

Olly Neal, Judge. John Ramsey worked for appellant Arkansas Electric Cooperative. While cutting a tree on May 22, 2001, Ramsey sustained severe injuries that ultimately led to his death. His wife, appellee Leigh Ramsey, sought benefits. The administrative law judge (ALJ) determined that (1) Ramsey's accident occurred in the course and scope of his employment, (2) Ramsey failed to prove by a preponderance of the evidence that Ark. Code Ann. § 11-9-102(4)(B)(iv) (Repl. 2002) is unconstitutional, (3) Ramsey's survivors failed to prove that they were denied due process in the manner in which the drug screen was conducted, and (4) Ramsey's injury and death were substantially occasioned by the presence of illegal drugs in his system. Ramsey's wife appealed to the full Commission.

The Commission reversed the ALJ's finding that Ramsey's accident and death were substantially occasioned by the use of illegal drugs detected in his urine specimen. This appeal followed.

On appeal, appellant argues that the Commission's finding that appellee is entitled to benefits is not supported by substantial evidence. Appellee cross-appeals, arguing that there is no substantial evidence to support the Commission's conclusion that use of routine hospital drug screens taken for purposes of treatment did not violate the due process rights of Ramsey's survivors. We affirm.

In reviewing a decision of the Workers' Compensation Commission, this court views the evidence and all reasonable inferences in the light most favorable to the findings of the Commission. *Magnet Cove Sch. Dist. v. Barnett*, 81 Ark. App. 11, 97 S.W.3d 909 (2003). These findings will be affirmed if supported by substantial evidence. *Id.* Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*; *Wheeler Constr. Co. v. Armstrong*, 73 Ark. App. 146, 41 S.W.3d 822 (2001). If reasonable minds could reach the result found by the Commission, we must affirm the decision. *Wal-Mart Stores, Inc. v. Brown*, 73 Ark. App. 174, 40 S.W.3d 835 (2001). In making our review, we recognize that it is the function of the Commission to determine the credibility of witnesses and the weight to be given their testimony. *See Williams v. L & W Janitorial*, 85 Ark. App. 1, 145 S.W.3d 383 (2004). Furthermore, the Commission has the duty of weighing medical evidence. *See id.*

■ Arkansas Code Annotated section 11-9-102(4)(B)(iv)(a) (Repl. 2002) provides that an injury is not compensable if it is the result of an accident that is substantially occasioned by the use of alcohol, illegal drugs, or prescription drugs used in contravention of physician's orders. "The presence of alcohol, illegal drugs, or prescription drugs used in contravention of a physician's orders shall create a rebuttable presumption that the injury or accident was substantially occasioned by the use of alcohol, illegal drugs, or prescription drugs used in contravention of physician's orders." Ark. Code Ann. § 11-9-102(4)(B)(iv)(b) (Repl. 2002). Whether the rebuttable presumption is overcome by the evidence is a question of fact for the Commission to determine. *Woodall v. Hunnicut Constr.*, 340 Ark. 377, 12 S.W.3d 630 (2000).

### 1. Direct Appeal

Ramsey's wife, Leigh Anne Ramsey, testified that she had been married to Ramsey since October of 1995 and that they had one child. She explained that she and Ramsey were separated at the time of the accident and were going through a divorce.[1] She noted that during the separation, Ramsey still cared for her and their child, and that prior to his accident, she and Ramsey had reconciled. Leigh Anne testified that, after the reconciliation, Ramsey had moved back into the family home. Leigh Anne testified that she knew about Ramsey's drug use and that his drug use was one of the issues in their marriage. On the morning of the accident, however, Leigh Anne noted that Ramsey did not appear intoxicated or impaired.

Eric McGinty testified that he worked with Ramsey on the day of his death. He testified that he was on Ramsey's crew on the day of the accident and that Ramsey was his supervisor. He explained that there were generally three men in the crew, but that one of the men was on vacation. McGinty testified that Ramsey was "totally safety conscious." He noted that he had never seen Ramsey do drugs in the two months that he had worked for him. He further testified that he had observed people he knew to be impaired after taking drugs like marijuana or methamphetamine, but that Ramsey did not appear to be impaired. McGinty testified that the tree was in a "tight spot" and that he and the other

---

[1] The divorce action was dismissed due to John's death.

crewman had passed on it the week before because it was too difficult for them to cut. He stated that the plan was to go back and take the tree down. He testified:

> I remember this tree being situated, you had a power line running in between the back of the houses, and it fed all the houses down this strip. You have a storage building on one side of the tree, you got a service wire around the other side of the tree, the side of the service wire, you've got a fence and I believe it was a little mobile home, or a recreational home. And on the other side of the tree, you had the mobile home of the resident. We only had a few feet to play with, to drop the tree in. The employer expected us to remove trees without damaging the property of the customers.

> * * *

> Sam was on vacation and I was the only other person that was present. John and I were working together. The work proceeded by him going up in a bucket truck and starting to trim the low-lying limb around the tree to take the tree out without causing too much damage to the property or the property owner's trees in the area. After that, I believe he called William Ammons that he knew was in the shop and asked if he could borrow one of his guys. I'm talking about William Ammons, Jr. He is another crew foreman. I believe he made the phone call around 10:45. John and I had worked together from the time of arrival at the scene until this point. My function during this period of time was to make sure that John was not doing anything unsafe and if something did happen I was there to assist him in any medical or mechanical needs that was necessary.

McGinty testified that he did not observe John doing anything unsafe during that period of time; Ramsey had his harness on and his lanyard attached. He testified that Ramsey came down, and they went to pick up another crewman, Craig Willis. He noted that the drive was thirty minutes, that they rode together, and that Ramsey did no drugs. They picked Craig up, went back to the location, and "topped out" a section of the tree. They then broke for lunch. McGinty testified that Ramsey excused himself during lunch to make a phone call. He did not observe Ramsey using any drugs during that break and did not find Ramsey to be impaired in any way. He testified:

> We loaded back up in a truck and drove out to the line where we were working, the same one as in the morning, and proceeded to

top out the rest of the tree. When I say, "top out the rest of the tree," we rig the ropes again like I've described. It was the same basic plan. The ropes would break the fall and then let it down. It worked according to plan. John did all that rigging and he done the cutting.

Next, he came down out of the bucket truck, and from what I remember, he went and got a drink of water because it was a pretty warm day that day. When he climbed back in the bucket truck, I asked him if he wanted a rope to put in the last stob that we were going to fall, and he said no and me and Craig asked him again if he wanted a rope to put in the top of the stob that we were going to fall; he said, "No, I got it. It is going to fall where I need it to."

Next, McGinty testified that Ramsey got back in the bucket to make his cut. He stated:

After he made his notch cut, he began cutting on the back side of the tree, his falling cut. And at that time — up until the tree started rotating around towards his position, the tree was going the exact way we planned on falling it. There was lean in the tree that would have aided in the falling of the tree. The lean was somewhere around probably 15 degrees off the tree. It was in the direction that the tree was intended to fall. In my experience of tree cutting, it is generally beneficial if the tree is leaning in the direction you want it to fall.

He started his back cut and proceeded to cut the tree and was working his meat, which allows you to fall the tree in the area you want. Meat on a tree is the wood part on the inside of the tree. . . . And apparently, he missed just a few splinters of meat on his side. . . . John reacted by saying a cuss word, dropped his chainsaw in the bucket, and proceeded to try to push the tree off the boom truck to keep it from hitting him. . . .

He put his hands on the tree and was proceeding to try to push it off enough to keep it from falling on his boom. And, apparently, when that was not going to succeed, right before it hit the boom, I seen him grasp the sides of the bucket and prepare for impact. I observed the tree hit the boom; I believe it compressed the hydraulics. . . . John left up in the air. You know, it knocked the boom all the way down to the ground, left John in the air; when the log rolled off, the boom came back up, slapped John up about 45 feet in the

air. When he came down, he hit his head on the bucket truck and bounced to the ground. . . . I do not believe he was conscious when he hit the truck. When he was on the ground, he was not conscious. He was not able to speak to me. I tried to regain contact to him while he was on the ground[.]

William Ammons, Sr., also testified at the hearing. He testified that he had known Ramsey for six years and that he had seen Ramsey twice on the day of the accident. He testified that he took lunch with him and that he was with Ramsey the entire time, except for when Ramsey went to use the phone. Ammons, Sr., testified that Ramsey did not use drugs in his presence and that he did not appear to have been impaired when he came back from using the phone.

William Ammons, Jr., testified that he also saw Ramsey on the day of the accident when he came by to get one of his men, Craig Willis. Ammons, Jr., stated that John did not appear to be acting unusual and that he had never seen Ramsey use drugs. He testified:

As far as being friends with John Ramsey, I was pretty much with him 24/7. Not only did we work together when I was a crew person, but we also socialized. Me and my wife would socialize with him and his family. I never saw him do drugs. I did not know he did drugs. But I was with him 24/7.

Thereafter, appellants put on the evidence of pharmacologist/toxicologist Doctor Kim Edward Light. Dr. Light testified that he reviewed Ramsey's medical records for appellants and that as far as his opinion:

I can't say he was under the influence of THC within the past seven hours. I believe he was under the influence of methamphetamine within the past seven hours. Within use of seven hours, I would expect the same kind of results on Mr. Ramsey as I described previously as the general effects that you would see with someone that has ingested methamphetamines.

Dr. Light testified on cross that "I'm not in a position to express an opinion as to whether or not the reactions specific to John Ramsey himself and his actions at the time would evidence impairment or being affected by the drug."

Larry Harp, manager of safety and loss control at Arkansas Electric Cooperative, testified that he received a call that Ramsey

had been involved in an accident and that he went to the site to investigate. He found that at the time of the accident the harness was not buckled into the lanyard or the ring on the bucket truck. He testified, "[Ramsey] was wearing the harness and the lanyard was attached to the harness, but the other end of the harness was not snapped into — the strap that holds it to the aerial lift [device]."

Richard Hink testified that he supervised Ramsey's crew and that the use of a rope is a "judgment call, pretty well, because there's nothing that — every job we do is different. So it's a judgment call." He testified that had he done the cut, he would have "most definitely used a rope."

■ Following its review of the evidence, the Commission determined that:

> There is no evidence before the Commission that the claimant was impaired at this point. McGinty testified, "apparently, he missed just a few splinters of meat on his side . . . . I observed the tree lean, then stop, then kind of rotate back towards John and the bucket truck." Ramsey had the presence of mind to try to push the falling tree away from him, but of course the 1,100 pound section fell against the boom, catapulting the claimant out and causing injury leading to the claimant's death.

> Richard Hink, the claimant's boss, arrived at the scene shortly afterward. Mr. Hink agreed that the crew should have used ropes in felling the tree, but he also testified, "it's a judgment call." In hindsight it is apparent that the claimant probably used poor judgment in not attaching ropes before cutting down this heavy tree on May 21, 2001. However, there is nothing before the Commission indicating that amphetamine, methamphetamine, or marijuana (THC) caused this poor judgment. We note Mr. Hink's credible testimony after looking at pictures, "the cut is not so bad a cut, I mean, it would have worked fine how it was. The main problem with what John did, and that happens all the time, is the tree was cut plum off and just turned loose free, standing up."

> We can find no indication on the date of the injury that illegal drugs were in any way the cause of the fatal accident. None of the hospital records show a causal connection between the claimant's

alleged drug use and the accidental injury. This issue arose after a urine sample detected methamphetamine and marijuana. Nevertheless, not one of the expert toxicologists could state when the claimant had ingested these drugs. None of the claimant's co-workers, out of four witnesses, saw the claimant use drugs or otherwise exhibit signs of impairment. Even Dr. Light, the respondents' expert witness, conceded that he was not in a position to personally opine whether illegal drug use caused the fatal injury. Any conclusion that the claimant's arguable deviation from routine safety precautions was substantially occasioned by the presence of illegal drugs in his urine specimen appears to be based on speculation and conjecture, which can never be permitted to supply the place of proof.

The Full Commission recognizes that the presence of illegal drugs in the claimant's physical specimen created a statutory rebuttable presumption that the accident on May 21, 2001 was substantially occasioned by the use of illegal drugs. The burden shifts to the claimant to prove, by a preponderance of the evidence, that the illegal drugs did not substantially occasion the accident. Whether the rebuttable presumption is overcome by the evidence is a question of fact for the Commission to determine. Woodall v. Hunnicutt Construction, 340 Ark. 377, 12 S.W.3d 630 (2000). Based on the record before us, the Full Commission finds that the claimant has proven by a preponderance of the evidence that the illegal drugs did not substantially occasion the accident, thus rebutting the presumption. Much emphasis has been placed on the fact that the claimant had apparently not re-attached a safety lanyard when he got back into the bucket and resumed his employment services on the afternoon in question. It has been suggested that the claimant might still be alive if he had attached the lanyard. Whether or not that is true, we cannot find from the evidence that use of a lanyard would have prevented an accident after the 1000-plus pound tree fell on the boom truck. The claimant still would have been injured, perhaps seriously. The Full Commission notes the case of ERC Contractor Yard & Sales v. Robertson, 335 Ark. 63, 977 S.W.2d 212 (1998). In that case, the Supreme Court held that substantial evidence supported the Commission's finding that the claimant's accident was not substantially occasioned by the claimant's use of alcohol. The Commission in Robertson had relied on credible witness testimony, which we do in the present case.

The Full Commission reverses the decision of the administrative law judge. Pursuant to Ark. Code Ann. § 11-9-102(4)(B)(iv)(d), we find that the claimant proved by a preponderance of the evidence that illegal drugs did not substantially occasion the accident on May 21, 2001. Our finding in this regard effectively renders moot the claimant's arguments relating to constitutionality, admissibility of the drug screen, and chain of custody.

■ As substantial evidence supports the Commission's decision, we affirm.

### 2. Cross-appeal

Appellee cross-appeals, arguing that substantial evidence did not support the Commission's decision that use of routine hospital drug screens taken for purposes of treatment did not violate the due process rights of Ramsey's survivors. Because we affirm appellee's award of benefits, we do not reach her cross-appeal.

Affirmed.

STROUD, C.J., and CRABTREE, J., agree.

## SUPPLEMENTAL DISSENTING OPINION ON DENIAL OF REHEARING NOVEMBER 3, 2004

SAM BIRD, Judge, dissenting. Petitioners have asked this court to rehear this case for three reasons: (1) the finding that Ramsey rebutted the presumption that his accident and death were substantially occasioned by his use of drugs is not supported by substantial evidence; (2) Arkansas Code Annotated section 11-9-102(4) creates a presumption that must be rebutted by the claimant, with the burden of proof being on the claimant rather than the employer; (3) this court failed to recognize that the evidence of Ramsey's not hooking his safety harness and not using ropes was evidence of poor judgment, impaired by the drugs in his system. I would grant the petition on the first two points.

In this case, both this court and the Commission noted that the presence of illegal drugs created a rebuttable presumption under Arkansas Code Annotated 11-9-102(4)(B)(iv)(a) (Repl. 2002) that Ramsey's accident and death was substantially occasioned by use of the illegal drugs. I believe, however, that the

following excerpt from the Commission's decision shows that it incorrectly applied the statutory presumption:

> We can find no other indication on the date of the injury that illegal drugs were in any way the cause of the fatal accident. None of the hospital records show a causal connection between the claimant's alleged drug use and the accidental injury. This issue arose after a urine sample detected methamphetamine and marijuana. Nevertheless, not one of the expert toxicologists could state when the claimant had ingested these drugs. None of the claimant's co-workers, out of four witnesses, saw the claimant use drugs or otherwise.

Petitioners' first argument is that substantial evidence does not support the finding that Ramsey rebutted the statutory presumption that the accident and death were substantially occasioned by the use of the illegal drugs. After noting that a urine sample revealing the presence of illegal drugs gave rise to the statutory presumption, the Commission pointed to the inability of expert toxicologists to state when the claimant had ingested these drugs. The Commission did not, however, discuss Dr. Light's testimony that he believed that Ramsey "was under the influence of methamphetamine within the past seven hours." The Commission may not disregard the testimony of any witness. *Patchell v. Wal-Mart Stores, Inc.,* 86 Ark. App. 230, 184 S.W.3d 31 (2004). I would reverse and remand to the Commission for consideration of all the evidence as to whether Ramsey rebutted the presumption that the presence of illegal drugs in his system substantially occasioned the accident that led to his death.

I would also remand on the basis of petitioners' second argument, that the Commission did not assign to the claimant the burden of rebutting the presumption. Under Arkansas Code Annotated 11-9-102(4)(B)(iv)(d), an employee shall not be entitled to compensation unless it is proved by a preponderance of the evidence that the illegal drugs did not substantially occasion the injury or accident. The burden of proof of a compensable injury shall be on an employee. Ark. Code Ann. § 11-9-102(4)(E). After noting that the presence of illegal drugs created a rebuttable presumption that Ramsey's accident was substantially occasioned by the use of illegal drugs, the Commission then inexplicably found that there was "*no other indication on the date of injury that illegal drugs were in any way the cause of the fatal accident.*" Rather than beginning its analysis with the presumption that the illegal drugs

caused the accident, and then examining the evidence to determine whether Ramsey had rebutted it, the Commission found that the presumption had been rebutted because there was no *other indication* that illegal drugs caused the fatal accident. The effect of the Commission's decision is to shift to the employer the burden of proving that the illegal drugs substantially occasioned the employee's injury, contrary to the purpose of the rebuttable presumption.

I would grant the petition for rehearing, and would reverse and remand this case to the Commission for its consideration of Dr. Light's testimony and for a correct analysis of the rebuttable presumption that the presence of the illegal drugs caused the fatal accident.